## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| SHONA CHAVIS, HOLDEN SANDERS, and EMANUEL CHAVIS, <br><br> Plaintiff, <br><br> v. <br><br> TROY LAWRENCE, JR., in his personal capacity, MURPHY PAUL, in his official capacity, BATON ROUGE POLICE DEPARTMENT, CITY OF BATON ROUGE, and PARISH OF EAST BATON ROUGE. <br><br> Defendants. | No. 23-cv-1129 |

## <u>COMPLAINT</u>

1.  This lawsuit involves a well-connected Baton Rouge police officer who has, time and again, violently violated the constitutional rights of Baton Rouge citizens. In this case, Ofc. Lawrence physically attacked four different individuals in the span of ninety seconds; falsely arrested two of them using excessive force; and nearly injured other law enforcement officers who sought to properly deescalate the situation. As in numerous past incidents, this unnecessary violence occurred for one reason: Ofc. Lawrence was incapable of accepting valid criticism of how a minimally competent police officer should do his job.

2.  But it is also about institutional rot within the Baton Rouge Police Department that has repeatedly enabled dangerous behavior by Ofc. Lawrence and other violent officers like him. Long before the events described in this complaint, Ofc. Lawrence's criminal wrongdoing had garnered

national attention. That Ofc. Lawrence might be *criminally* prosecuted for on-the-job wrongdoing was first suggested by Hon. Brian A. Jackson in a written opinion in December 2020, but since that time, his misconduct has gotten far worse. Well before the current incident, high-ranking BRPD officials refused to work alongside Ofc. Troy Lawrence, Jr., warning BRPD Internal Affairs: "I don't know what he is capable of."  Ofc. Lawrence's violent temper has been well-known to BRPD leadership for years, but instead of addressing Ofc. Lawrence's well-known anger management problems, the department has (1) falsely claimed to be investigating Ofc. Lawrence when they were not, (2) illegally retaliated against those who have publicized Ofc. Lawrence's wrongdoing, (3) hid his misconduct from their own lawyers, and (4) celebrated and defended his unlawful conduct as consistent with BRPD policy. In violating the rights of Baton Rouge citizens, Ofc. Lawrence has simply been complying with the custom and policy of retaliation and brutality that has been the norm at BRPD for at least the past decade.

## PARTIES

3.   Plaintiffs SHONA CHAVIS and her sons EMANUEL CHAVIS and HOLDEN SANDERS are citizens of the United States. SHONA and EMANUEL reside in Denham Springs, Louisiana; HOLDEN resides in Baton Rouge, Louisiana.

4.   Defendant TROY LAWRENCE, JR. is a resident of Louisiana and is employed by the Baton Rouge Police Department. He works for Defendants BATON ROUGE POLICE DEPARTMENT, CITY OF BATON ROUGE and PARISH OF EAST BATON ROUGE. Defendant CITY OF BATON ROUGE is a political subdivision of the State of Louisiana. The city's governing authority is consolidated with the government of EAST BATON ROUGE PARISH. Defendant PARISH OF EAST BATON ROUGE is a political subdivision of the State

of Louisiana. The Parish's governing authority is consolidated with the government of the CITY OF BATON ROUGE.

5.   BRPD CHIEF MURPHY PAUL is the final policymaker for the municipal defendants as it pertains to official policy governing use of force and respect for the First Amendment rights of Baton Rouge citizens by Baton Rouge Police Department employees.

**I.     THE EVENTS OF OCTOBER 8, 2022**

**A.  OFC. LAWRENCE COMMITS FOUR BATTERIES IN 90 SECONDS, WHILE CURSING AT OTHER (NON-BRPD) OFFICERS WHO REFUSE TO JOIN HIS BRUTALITY**

6.   On October 8, 2022, family members of Malik Chavis rushed to Our Lady of the Lake Hospital.

7.   A BRPD officer or officer shot Malik Chavis earlier that evening.

8.   Malik Chavis was initially charged with attempted murder of Baton Rouge police officers, but these charges were subsequently dropped.

9.   Ofc. Lawrence was aware that his BRPD colleagues had just shot Malik Chavis.

10. Approximately 100 yards from the front entrance to the hospital, Ofc. Lawrence overheard a verbal argument between brothers Holden Sanders and another family member.

11. Within twelve (12) seconds of turning on his body-worn camera, Ofc. Lawrence can be heard cursing.

12. Within thirty-five (35) seconds of Ofc. Lawrence turning on his body-worn camera, Holden Sanders enters the driver's side door of his car, and Emanuel Chavis is walking to the passenger's side, obeying Ofc. Lawrence's profane and aggressive commands to disperse.

13. While dispersing, Emanuel criticized Ofc. Lawrence's professional and attitude, stating that Ofc. Lawrence was "doing too much."

14. Rather than ignore the criticism, Ofc. Lawrence again used profanity: "I'm doing too much? Okay. Get the fuck [out of here]."

14. Holden, still moving to get into his car, asked Ofc. Lawrence to "stop talking to us like that."

15. Within eight seconds of Holden's request that Ofc. Lawrence "stop talking to us like that," Ofc. Lawrence rapidly approached Holden stating, "Whatcha going to do?! Whatcha going to do?!" and began grabbing him by the wrist.





16. In sworn testimony, Ofc. Lawrence has previously described such behavior as BRPD-approved "de-escalation" that was part of his training.

17. Specifically, Ofc. Lawrence has testified that BRPD "de-escalation training" consists of the following: "Based off of [BRPD] training, you know, we are taught to, I guess, keep increasing, or – you know, I'm trying to see what word to use. We were taught to, you know, initially, you know, get [citizens] to resolve whatever matter it is somewhat peacefully at that time, and the from there, when people aren't responding to that, then we have to take it up a notch, whether it's increase the tone in our voice, start putting handcuffs on people, that sort of stuff."

18. Ofc. Lawrence testified truthfully.

19. Holden made no physically aggressive movement toward Ofc. Lawrence before Ofc. Lawrence grabbed his wrist.

20. Indeed, throughout the entire encounter, never once did Holden strike or attempt to strike Ofc. Lawrence.

21. Ofc. Lawrence continued to shove Holden in the chest while yelling, "Get in the fucking car."

22. Ofc. Lawrence then began to shove Emanuel, too.



20. Throughout the entire encounter, never once did Emanuel strike or attempt to strike Ofc. Lawrence.

21. Ofc. Lawrence then used profanity again, yelling at Emanuel: "You get in the fucking car, too!"

22. Holden Sanders was then seated in the driver's side of his car, but could not close the door without striking Ofc. Lawrence.

23. To nearby observers, Holden explained: "I am trying to leave. I am trying to [leave] but he [Ofc. Lawrence] is standing in the front of the door."

24. In response, Ofc. Lawrence stated, "I'm going to help you out," and reached for Mr. Sanders' neck.



25. He then shoved Holden into the car and slammed the driver's side door.

26. Holden remained inside the car as directed, and at no point (until Ofc. Lawrence subsequently opened the driver's side door) did Holden attempt to open the car door.

27. Just four seconds later, Ofc. Lawrence placed his hands on a third private citizen.

28. This individual also was not posing any physical threat to Ofc. Lawrence and was not suspected of any criminal wrongdoing.



28. From the driver's seat of his car, while waiting for Emanuel to climb into the passenger's seat, Holden rolled down his window and told Ofc. Lawrence (three times) that his misconduct was being captured on body-worn camera.

29. In response to these comments, Ofc. Lawrence stated "Alright," opened the car door, and began attempting to physically remove Holden from the car.

30. At no time before or during his physical altercation with Holden did Ofc. Lawrence instruct Holden to step out of the vehicle.

31. At no time before or during the physical altercation with Holden did Ofc. Lawrence inform Holden that he was under arrest.



33.    Scared that she was about to watch the lynching of her son, Ms. Shona Chavis attempted to calm Ofc. Lawrence down.



34.    Ofc. Lawrence struck Ms. Chavis multiple times with his hand.

35.    Unable to drag Holden from his vehicle, Ofc. Lawrence began to choke him by the neck and grab him by his hair.









36. Numerous other law enforcement officials watched Ofc. Lawrence's behavior but initially refused to assist him.

37. The non-intervention of other (non-BRPD) law enforcement prompted Ofc. Lawrence to shout to the other officers: "CAN Y'ALL FUCKING HELP?! GOD DAMN!"

38. The other officers still refused to join Ofc. Lawrence's physical interaction with Holden.

39. Holden placed his hands on the steering wheel of the vehicle while repeating, "I ain't touching you; I ain't touch you; I ain't doing nothing" at least 18 times.



40. Approximately 30 seconds after first yelling "CAN Y'ALL FUCKING HELP?!", Ofc. Lawrence again addressed the other officers, this time stating: "WHAT THE FUCK ARE Y'ALL DOING?! YOU'RE NOT GOING TO HELP?!"

41. In a sworn police report, Ofc. Lawrence wrote that the other officers had not come to his assistance initially because they were "obliviously engaged in a verbal conversation nearby and unaware that I needed assistance."

42. This statement was false.

43. Finally, a non-BRPD officer physically interposed himself between Ofc. Lawrence and Holden.

44. Holden calmly explained that he would leave the car and comply with an officer that his not brutalizing him.

45. Motioning for Ofc. Lawrence to get back, the sheriff's deputy repeatedly stated to Ofc. Lawrence: "I got it, I got it, let me get it, let me get."





46. As soon as Ofc. Lawrence moved back and Holden received assurances he would not be brutalized further, Holden stepped out of the vehicle peacefully.

47. Holden complied with the non-violent sheriff's deputy in a matter of seconds after the deputy successfully asked Ofc. Lawrence to step back.

### B.  OFC. LAWRENCE RETALIATES AGAINST EMANUEL

48. Then Ofc. Lawrence arrested Emanuel.

49. Explaining himself, Ofc. Lawrence offered: "I asked him to leave, too."

50. Emanuel had not dispersed because he had been ordered to get into Holden's car, and Holden was prevented from leaving because Ofc. Lawrence was physically engaging him.

51. Emanuel filmed Ofc. Lawrence's brutality toward Holden.

52. Ofc. Lawrence was aware that Emanuel was filming him.

53. Ofc. Lawrence was substantially motivated to arrest Emanuel because he was angry that Emanuel had directed unkind words toward him and because he was filming him.

54. When Ofc. Lawrence placed Emanuel in the back of his BRPD police car, he slammed the door so suddenly and violently that he nearly struck a different sheriff's deputy, forcing the deputy to jump back in a cowering position.



54. Emanuel experienced acute pain from Ofc. Lawrence's decision to place the handcuffs on him tightly.

55. When first placed in cuffs, he complained, "He hurting me! He hurting my arm! . . . Man, call the Sergeant out here, man!"

56. Ten minutes later, Emanuel again asked for his handcuffs to be loosened.

57. Eight minutes after that, Emanuel again explained, "I can't feel my hands right now" and explained that the handcuffs are "Cutting off my circulation right now."

58. Ofc. Lawrence was subjectively aware that Emanuel was complaining of pain.

59. Ofc. Lawrence heard all of Emanuel's complaints and had the opportunity to loosen the cuffs, but chose not to do so.

60. When Emanuel complained about the handcuffs, he responded: "Well, whenever you fight with me . . . that's what happens."

### C.  OFC. LAWRENCE EXPLAINS HIMSELF

61. Ofc. Lawrence explained that he first used force against Holden to push him *into* the car because "they wanted to still mouth off . . . so at that point, I'm going to force y'all inside y'all's car."

62. Ofc. Lawrence explained that his decision to arrest Holden and Emanuel was motivated in part because they were "saying extra stuff that didn't need to be said."

63. After Shona Chavis explained that Ofc. Lawrence was still acting in an "unprofessional" manner, he rolled up the window of his police car and stated, "Shit!"

64. Ofc. Lawrence's conduct October 8, 2022 when interacting with plaintiffs was consistent with his training.

65. Ofc. Lawrence's conduct on October 8, 2022 was reviewed by high-ranking BRPD employee Lt. Darryl Honore, who approved of his conduct.

66. Ofc. Lawrence stated they, "They train us a certain way. I gotta do all that."

67. Ofc. Lawrence's conduct on October 8, 2022 was consistent with his training.

68. Ofc. Lawrence's conduct on October 8, 2022 was consistent with BRPD policy.

### D.  **OFC. LAWRENCE MATERIALLY MISREPRESENTS THE ENCOUNTER TO SUPPORT A BOGUS CRIMINAL CASE AGAINST HOLDEN AND EMANUEL**

69. Ofc. Lawrence subsequently authored a police report accusing Holden and Emanuel of "resisting an officer" and "disturbing the peace."

70. Ofc. Lawrence's description of the incident in his police report ran 1,072 words.

71.  It was the longest police report he has ever written for an arrest that resulted in municipal charges no greater than "disturbing the peace" and "resisting arrest."

72. The report contains numerous material misrepresentations or critical omissions.

73. The report falsely indicates that Holden and Emanuel engaged in criminal activity.

74. The report omits Ofc. Lawrence's role in provoking violence and escalating the situation.

75. The report notes the arrestee's profane language but omits any reference to Ofc. Lawrence using profane language throughout the encounter.

76. The report falsely states that the non-BRPD officers who refused to assist Ofc. Lawrence in brutalizing Holden were "obliviously engaged in a verbal conversation nearby and unaware that I needed assistance."

77. The report intentionally minimizes the amount of force and violence Ofc. Lawrence used in effectuating (or attempting to effectuate) the arrests of Holden and Emanuel.

78. The report omits any mention of Emanuel repeatedly indicating that he was in pain because of Ofc. Lawrence's handcuffs.

79. The report omits any mention of Ofc. Lawrence's use of force against Shona Chavis or the other citizen Ofc. Lawrence shoved.

80. For seven months, but Holden and Emanuel had criminal cases pending against them because of Ofc. Lawrence's false and misleading police report.

81. Finally, upon reviewing the evidence, in May 2023, the Baton Rouge Parish Attorney decided to drop all charges against both plaintiffs.

82. Despite the determination by the Baton Rouge Parish Attorney office that no criminal charges should be pursued, no investigation or disciplinary action into Ofc. Lawrence was taken.

83. At all times the criminal charges against Holden and Emanuel were meritless.

84. Months later, Shona Chavis continues to suffer from serious pain in her shoulder from where Ofc. Lawrence struck her.

85. Emanuel has continuing pain in his wrists; he is unable to pick up his child with one hand as a result of injuries Ofc. Lawrence inflicted.



## II. TROY LAWRENCE JR.'S TROUBLED HISTORY (AND POLICYMAKERS' DELIBERATE INDIFFERENCE TO THE OBVIOUS CONSEQUENCES OF HIS RECURRING MISCONDUCT).

84. During Troy Lawrence Jr.'s short tenure as a BRPD officer, his dangerous temper has led to numerous Internal Affairs investigations.

85. Troy Lawrence, Jr. is the son of BRPD Deputy Chief Troy Lawrence, Sr.

86. Apart from Chief Murphy Paul, Deputy Chief Troy Lawrence Sr., is currently the highest paid employee of BRPD.

87. No BRPD employee with Troy Lawrence Jr.'s seniority has been suspended by BRPD more times for misconduct (without being terminated) than Troy Lawrence Jr.

88. No BRPD employee has been suspended by BRPD more times for misconduct (without being terminated) than Troy Lawrence Jr. in the past two years.

89. BRPD claims to have placed Troy Lawrence Jr. in an "Early Intervention System."

90. He was placed in the "Early Intervention System" in response to media inquiries.

91. The so-called "Early Intervention System" has never been successful: the only other participant in the program was terminated for misconduct.

### A.    CLARENCE GREEN INCIDENT

92. Shortly after joining the force, Ofc. Lawrence's misconduct made national news when he strip-searched a minor child in public; illegally searched that child's mother's apartment without a warrant; and then threated to beat a handcuffed detainee.

93. Judge Brian A. Jackson (who was unaware of the threatened beating) described the January 1, 2020 incident as follows: "[T]he state agents in this case demonstrated a serious and wanton disregard for Defendant's constitutional rights, first by initiating a traffic stop on the thinnest of pretext, and then by haphazardly invading Defendant's home (weapons drawn) to conduct an unjustified, warrantless search. Such an intrusion, in abject violation of the protections afforded by the Fourth Amendment of the United States Constitution, which protects citizens against unwarranted governmental intrusions in their homes, may justifiably be considered to be a trespass subject to prosecution under La. R.S. 14:63."

94. After the home search, when BRPD officers attempted to pressure Ms. Green into consenting to allow them to take a DNA sample from her minor child, Clarence Green (from the back of a police car) advised his mother to call a lawyer.

95. Troy Lawrence Jr. then threatened to beat Clarence Green while he was handcuffed and locked in the back of a police car, stating: "If you don't shut the fuck up, I'm gonna come in and I'm gonna fuck you up. You think I'm playing with you? I will fuck you up."

96. Despite Judge Jackson's ruling on December 29, 2020, the filing of a civil rights lawsuit on January 2, 2021, and Baton Rouge Metropolitan Council's ratification of a $35,000 settlement on April 2021, no disciplinary investigation into Ofc. Lawrence was even *started* until (at earliest) May 24, 2021.

97. The investigation did not begin until after BRPD was contacted by journalists who had reviewed the footage that was released by the Green Family.

98. The "disturbing" footage of Ofc. Lawrence's misconduct was featured on the national nightly news program CBS EVENING NEWS on May 27, 2021.

99. On May 28, 2021, Chief Murphy Paul convened a press conference to address the national controversy caused by Troy Lawrence, Jr. and his colleagues.

100.    At the press conference, the first question posed by journalists was: "This happened almost 17 months ago. Would we be here talking about this today if that video had not come out?" Chief Paul responded: "Absolutely we would have. . . . We just had the last hearing, what was it, the 13th I believe? The 13th of this month was our last hearing. And we still have two other officers that we have not completed that investigative process. So yes, we still would have made that information available to the public once those administrative processes have concluded."

101.     Chief Paul omitted that the investigation into Ofc. Lawrence was not started before May 24, 2021.

102.     BRPD conducted an investigation into Troy Lawrence Jr.'s role in the Green Family case and Chief Paul personally reviewed the results.

103.     BRPD cleared Ofc. Lawrence of any violation of a "use of force" or search-and-seizure policies in connection with the initial stop of, initial search of, and threatened violence against Clarence Green and his brother.

104.     On January 19, 2023, Ofc. Lawrence testified under oath about the aforementioned incident.

105.     Ofc. Lawrence swore that he "was suspended for cursing, using profanity."

106.     Ofc. Lawrence swore that he had no idea he was one of the "John Doe" defendants named in Clarence Green's civil rights suit.

107.     Ofc. Lawrence swore that he had no recollection of being featured on a national news broadcast or that Chief Paul had convened a press conference to discuss the incident he was involved in.

108.     Ofc. Lawrence swore that he did not believe that he had assaulted Clarence Green by threatening to "fuck him up" while he was handcuffed.

109.     Ofc. Lawrence received no additional training, counseling, or anger management in connection with this incident.

110.     BRPD Chief Murphy Paul personally oversaw the disciplinary inquiry into Ofc. Troy Lawrence, Jr., for misconduct related to the Green Incident. He personally decided that no discipline would be imposed for conduct a federal judge indicated was potentially *criminal*

(including the search of the Green brothers and the illegal home invasion of the Green apartment) because he was a young officer who was being trained by a more experienced officer.

### B.    SHERMANIE REED INCIDENT

107.    Ofc. Lawrence also used force and violence against another motorist, Shermanie Reed, who (correctly) told him he was acting unprofessionally on October 31, 2020.

108.    The similarities to this incident are striking: there, Ofc. Lawrence arrived on the scene, began cursing at the parties, began pushing individuals who posed no physical threat to him, ordered motorists into their cars, ripped a motorist out of their car, falsely arrested them, swore out a self-serving police report, injured the civilian, and then released them.

109.    As in this case, Ofc. Lawrence grossly misrepresented the details of the encounter in a police report (and subsequent Internal Affairs investigation).

110.    As in this case, BRPD insisted that Ofc. Lawrence's conduct was consistent with BRPD policy (apart from muting his body-worn camera).

111.    BRPD conducted an investigation into the case and Chief Paul personally reviewed the results.

112.    Ofc. Lawrence's interview with Internal Affairs included numerous obvious false statements.

113.    The investigation cleared Ofc. Lawrence of all wrongdoing in that case apart from muting his body-worn camera.

114.    In September 2021, undersigned counsel wrote Parish Attorney Andy Dotson to alert him to Ofc. Lawrence's misconduct and to highlight misrepresentations in his Internal Affairs interview. The letter sought a meeting with Chief Paul regarding the incident.

115.    Andy Dotson did not respond.

116.     Ms. Reed sued Ofc. Lawrence and Chief Paul for false arrest, excessive force, and First Amendment retaliation on October 30, 2021.

117.     Her complaint emphasized that Ofc. Troy Lawrence already "boast[ed] a lengthy record of professional misconduct during his short career."

118.     In numerous conversations in late 2021 and early 2022, BRPD's attorney was advised by undersigned counsel that Ofc. Troy Lawrence was likely to maim or seriously injure someone in a future incident if they failed to intervene.

119.     At Ofc. Lawrence's deposition on January 19, 2023, he repeatedly lied about the facts of the case.

120.     On January 21, 2023, BRPD's counsel was sent another letter highlighting examples of Ofc. Lawrence's perjury in his deposition and reiterating counsel's ongoing concerns: "Officer Lawrence is going to seriously injure or kill someone if he remains on the force. It is disheartening to learn that, since the filing of this lawsuit, Officer Lawrence has been *suspended* at least three (3) additional times for on-the-job misconduct and is currently the subject of an internal investigation for additional police brutality in December 2022."

121.     Within two months of Ofc. Lawrence's deposition, BRPD agreed to a $55,000 settlement to resolve the claims arising from that incident.

122.     Ms. Reed was willing to settle for $40,000 and an apology, but BRPD refused to authorize the settlement.

123.     BRPD still maintains that Ofc. Lawrence did nothing wrong apart from muting his body-worn camera during his encounter with Ms. Reed.

124.     Ofc. Lawrence received no additional training, counseling, or anger management in connection with this incident.

125.    Throughout Shermanie Reed's lawsuit against Troy Lawrence Jr. and BRPD, the Department withheld information from their own lawyers regarding Troy Lawrence's misconduct.

126.    The department redacted documents that were responsive to discovery requests to so that the names of witnesses who had pertinent information regarding Ofc. Lawrence's violent tendencies would not be revealed.

127.    Throughout the litigation, BRPD's counsel was repeatedly advised by Ms. Reed's counsel that Ofc. Lawrence posed an ongoing danger to the people of Baton Rouge, and that it was likely he would maim or kill someone if he wasn't removed from the force.

**C.    TROY LAWRENCE ALSO TRIES TO FIGHT HIS COLLEAGUES**

128.    Ofc. Lawrence has twice been the subject of Internal Affair investigations for altercations with a 20-year veteran of BRPD, Cody Gunter.

129.    On July 19, 2021, Ofc. Lawrence disregarded a direct order from Sgt. Gunter, telling him, "I don't give a fuck who you are."

130.    Ofc. Lawrence was suspended for 25 days.

131.    On March 6, 2022, Ofc. Lawrence called Sgt. Gunter "a pedophile" and attempted to fight him in public.

132.    Ofc. Lawrence stated, "I'll fuck you up right here in front of everybody."

133.    Ofc. Lawrence then took off his vest and attempted to fight Sgt. Gunter, who walked away to deescalate the situation.

134.    Ofc. Lawrence then called Sgt. Gunter "a pussy" a told him that he was going to "kick [his] ass."

135.    The events occurred in front of a crow of college students.

136.    When Sgt. Gunter returned to his car, Ofc. Lawrence followed him, yelling, "Get out the car you pussy."

137.    Under oath, Sgt. Gunter explained to Internal Affairs that he believed Ofc. Lawrence was dangerous and that he did not want to work in his presence. He expressed his fear: "I don't know what he is capable of."

> issue with me."
>
> -Do you have any personal vendettas against Ofc. Lawrence?
> ███████████ replied, "No."
>
> -Is there any reason that you feel you cannot work with or in the presence of Ofc. Lawrence and if so, please explain?
> ███████████ replied, "I would not be comfortable working in the presence of Ofc. Lawrence because I don't know what he is capable of.  I feel that he has a lot anger towards me and it's not going away."

137.    Ofc. Lawrence was suspended for this latter incident, as well.

138.    In at least one of the incidents, Ofc. Troy Lawrence Sr. was made aware of his son's wrongdoing as the incident was happening, and was asked by other BRPD officials to intervene with his son

139.    Ofc. Troy Lawrence Sr. was told that his son would be arrested if he did not promptly report to superior officers in connection with one of his altercations with Sgt. Gunter.

**D.    ADDITIONAL INTERNAL AFFAIRS INVESTIGATIONS**

136.    On December 22, 2022, local television station reported a story entitled "BRPD Opens Internal Investigation after Cell Phone Video Captures Violent Confrontation." *See* https://www.wbrz.com/news/brpd-opens-internal-investigation-after-cell-phone-video-captures-violent-confrontation/ (last accessed June 21, 2023).

137.    The video in question depicts Ofc. Troy Lawrence, Jr. repeatedly striking a handcuffed individual in the back of a police car.

138.    When questioned about the incident under oath on January 19, 2023, Ofc. Troy Lawrence Jr. claimed to have no recollection of the incident and no knowledge of any Internal Affairs investigation into the incident.

139.    During his deposition, Ofc. Lawrence also revealed that he had been suspended on at least one other occasion in 2022, although this information was never disclosed during discovery.

### E.    BRPD "TORTURE WAREHOUSE"

140.    In yet another recent incident, Ofc. Lawrence publicly stripped a young Black man, attempted to fight civilians, and then beat a detainee.

141.    On January 9, 2023, BRPD arrested Jeremy Lee, who is 21 years old, 5'6", and weighs 125 pounds without reasonable suspicion or probable cause.

142.    Jeremy Lee yelled in pain while Ofc. Lawrence and a partner searched him, complaining that—as a Black man—Ofc. Lawrence should not be so brutal with Black men. Ofc. Lawrence responded: "You're not my people."

143.    While Mr. Lee was handcuffed and on the ground, Ofc. Lawrence told him, "I'm about to bat the living crap out of you."

144.    Frightened and seeking some kind of fairness, Mr. Lee told the officers to "turn your [body-worn] camera on" and to "bat me then."





145.    A large crowd gathered nearby to witness BRPD activity.

146.    Ofc. Lawrence began to argue with members of the crowd. Ofc. Lawrence and one woman got into an argument during which he told her to "keep talking" and dared her to "show me."

147.    When another crowd member told Ofc. Lawrence he was acting unprofessionally, Ofc. Lawrence called the man "ignorant" and bragged about how much money he had.

148.    The argument nearly escalated into a physical altercation.

149.    Another BRPD officer intervened to separate Ofc. Lawrence from the agitated crowd.

150.    After being separated, Ofc. Lawrence tried to walk back over to the crowd to taunt them more, but two officers intervened to talk him down and walk him away. One explicitly told him to "chill out." Even his fellow officers saw his capacity for escalation and dangerousness.

151.    Instead of taking Mr. Lee to the East Baton Rouge Parish Prison, Ofc. Lawrence took Mr. Lee to a warehouse.



152.    While there, they took him out of a holding cell and severely beat him.

153.    Ofc. Lawrence and others repeatedly punched and kicked Mr. Lee.

154.    Mr. Lee was so badly beaten that authorities at East Baton Rouge Parish Prison refused to accept him when Ofc. Lawrence attempted to transfer Mr. Lee to their custody, insisting that Mr. Lee be taken to the hospital.

155.    Mr. Lee was diagnosed with broken ribs and other physical injuries as a result of his beating.

156.    Ofc. Lawrence constructed a false police report accusing Mr. Lee of attempting to escape from the torture warehouse.

157.    Ofc. Lawrence accused Mr. Lee of committing a "battery" against him, though the narrative portion of the report does not actually claim that Mr. Lee ever touched him.

### III.    BRPD'S LONG HISTORY OF RETALIATING AGAINST CRITICS AND FOSTERING A CULTURE OF IMPUNITY FOR POLICE VIOLENCE

158.    Ofc. Lawrence's longstanding pattern of retaliating against those who tell him he is acting unprofessionally is par for the course: it is precisely the same thing BRPD has done for the past decade.

#### A.    Clarence Green Retaliation

159.    When Ofc. Lawrence's wrongdoing in the Clarence Green matter became a national news story, BRPD filed a petition in state court seeking to have the Green Family's attorney held in contempt for releasing the body-worn camera footage; the statutory penalty for the species of contempt sought by BRPD was up to six months' imprisonment.

160.    In a 92-page opinion, Judge John W. deGravelles subsequently issued an injunction halting this prosecution, rejecting the applicability of "*Younger* abstention" and "find[ing] the overwhelming evidence in this case shows that the City/Parish acted in bad faith and in retaliation against Frampton for Frampton's issuance of a press release and Video which cast BRPD in a bad light." *Frampton v. City of Baton Rouge/Par. of E. Baton Rouge*, 21-CV-362-JWD-SDJ, 2022 WL 90238, at *35 (M.D. La. Jan. 7, 2022).

161.    Baton Rouge taxpayers paid over $85,000 to settle the lawsuit.

162.    BRPD still maintains that they did nothing wrong in retaliating against the attorney who served as a whistleblower in exposing Ofc. Lawrence's misconduct.

#### B.    Alton Sterling Retaliation

163.    In response to BRPD misconduct, thousands of Louisiana residents protested BRPD in 2016.

164.    BRPD responded with mass arrests of the protesters.

165.     Protestors argued the arrests were in retaliation for their exercise of their First Amendment rights to criticize BRPD, and their Fourth Amendment rights.

166.     They asserted *Monell* claims against BRPD and Baton Rouge, arguing that the wrongdoing was not just the result of individual official wrongdoing, but rather a policy or custom attributable to Baton Rouge itself.

167.     This Court rejected defendants' efforts to dismiss the protestors *Monell* claims. *See* Ruling and Order, *Imani v. City of Baton Rouge*, Case 3:17-cv-00439-JWD-EWD, Dkt. 347 (July 14, 2022).

168.     The City of Baton Rouge settled the case midtrial for $1,170,000.

### C.    Internal Whistleblower Retaliation

169.     After criticizing BRPD leadership, BRPD union vice president Siya Creel was unlawfully terminated by BRPD Chief Murphy Paul.

170.     The Municipal Fire & Civil Service Board unanimously decided Creel was wrongfully terminated.

171.     East Baton Rouge City-Parish ultimately paid $90,000 to settle Creel's claims of retaliation.

172.     A veteran officer in the BRPD Internal Affairs Division, John Dauthier, has also accused BRPD Chief Murphy Paul of internal wrongdoing, publicly claiming "blatantly partial doctrine for enforcing policies of the BRPD."

173.     Dauthier has alleged that he was retaliated against in part because he criticized BRPD leadership, whereas other officers who were well-liked by BRPD leadership were either not disciplined or less severely disciplined for similar wrongdoing.

### D.    Systemic Failings

174.     In April 2023, the non-profit news outlet VERITE released an extraordinary six-part expose called "In The Dark," documenting systemic BRPD violence and hostility toward those who questioned BRPD. *See* https://veritenews.org/tag/baton-rouge-police-department/ (collecting stories).

175.     Among other revelations, VERITE reported that the *sole* police officer investigated (let alone disciplined) for wrongdoing in connection with the 2016 protests was a BRPD officer who was investigated for questioning the legality of the police response at the protest.

176.     This reporting was accurate.

177.     VERITE reported that 100% of use-of-force complaints made in 2017 were adjudicated "exonerated" or "not sustained" by BRPD Internal Affairs.

178.     This reporting was accurate.

179.     The reporting also documented a department plagued by a culture of impunity, with meritorious citizen complaints regularly disregarded.

180.     Apart from minor errors that have since been included flagged as "Corrections" to the public available articles, there are no inaccuracies in the VERITE reports.

## JURISDICTION AND VENUE

181.    This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of state law of Plaintiff's rights as secured by the United States Constitution, as well as the deprivation of rights under Louisiana law.

182.    This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367. Venue is proper under 28 U.S.C. § 1391(b), because the defendants resides in this judicial district and the events giving rise to the claims asserted herein occurred in this judicial district.

## CLAIMS

### COUNT I - 42 U.S.C § 1983 – First Amendment Retaliation

183.     Plaintiffs repeat and reallege all of the paragraphs in this complaint as if fully set forth herein.

184.     As more fully described above, Defendant Troy Lawrence, Jr. deprived all plaintiffs of their constitutional right to be free from retaliation for engaging in protected First Amendment activity.

185.     As more fully described above, Defendant Troy Lawrence, Jr. deprived all plaintiffs of their constitutional right to be free from retaliation under the First Amendment to the United States Constitution.

186.     Specifically, plaintiffs allege that they were engaged in constitutionally protected activity in (correctly) criticizing Ofc. Lawrence's misconduct and filming him; Ofc. Lawrence was substantially motivated against the plaintiff's exercise of constitutionally protected conduct when he decided to arrest them and use physical force against them because of that protected activity; and that by arresting and using physical force against plaintiffs he caused them to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity.

187.     As a direct and proximate result of this deprivation of their constitutional right to be free from retaliation for First Amendment activity, Plaintiffs suffered injuries, including, but not limited to, significant physical injuries and emotional distress.

### COUNT II - 42 U.S.C. § 1983 – Fourth Amendment Unlawful Seizure

188.     Plaintiffs repeat and reallege all of the paragraphs in this complaint as if fully set forth herein.

189.     As more fully described above, Defendant Troy Lawrence, Jr. deprived plaintiffs Emanuel Chavis and Holden Sanders of their constitutional right to be free from unreasonable seizures.

190.     Defendant Lawrence arrested plaintiffs without a warrant and without probable cause to believe they committed a criminal offense.

191.     As a direct and proximate result of this deprivation of their constitutional right to be free from unreasonable seizures, Plaintiff suffered injuries, including, but not limited to, significant physical injuries and emotional distress.

**COUNT III - 42 U.S.C. § 1983 – Fourth Amendment Excessive Force**

192.     Plaintiffs repeat and reallege all of the paragraphs in this complaint as if fully set forth herein.

193.     As more fully described above, Defendant Troy Lawrence, Jr. deprived all plaintiffs of their constitutional right to be free from excessive force when he grabbed, pushed, punched, choked, excessively tightened handcuffs, and refused to loosen handcuffs.

194.     As a direct and proximate result of this deprivation of their constitutional right to be free from excessive force, Plaintiffs suffered injuries, including, but not limited to, significant physical injuries and emotional distress.

**COUNT IV - 42 U.S.C. § 1983 – Malicious Prosecution**

195.     Plaintiffs repeat and realleges all of the paragraphs in this complaint as if fully set forth herein.

196.    As more fully described above, Defendant Troy Lawrence, Jr. initiated criminal charges without probable cause against plaintiffs Emanuel Chavis and Holden Sanders, materially misrepresenting their encounter to falsely indicate that they had engaged in criminal activity.

197.    The criminal prosecution Defendant Lawrence initiated was resolved in plaintiffs favor, with a dismissal of all charges.

## COUNT V – 42 U.S.C. § 1983 – *Monell* Liability for Each of the Foregoing Constitutional Violations (COUNTS I, II, III, IV)

198.    Plaintiffs repeat and realleges all of the paragraphs in this complaint as if fully set forth herein against BRPD and all municipal defendants.

199.    Plaintiffs further allege that BRPD maintains and implements formal written policies regarding use-of-force and responses to citizen criticism that caused the constitutional violations alleged in this complaint.

200.    Plaintiffs further allege that there is a pattern, practice, custom, and informal policy of false arrests, excessive force, and retaliation at BRPD; that this widespread recurring practice is so permanent and settled that it constitutes formal policy; and that adherence to that practice caused the constitution violations at issue in this complaint.

201.    Plaintiffs further allege that Ofc. Lawrence was inadequately trained; that this inadequate training caused their constitutional injuries; and that BRPD and the Parish-City was deliberately indifferent to the constitutional rights injured.

202.    Plaintiffs further allege that Ofc. Lawrence was inadequately supervised; that this inadequate supervision caused their constitutional injuries; and that BRPD and the Parish-City was deliberately indifferent to the constitutional rights injured.

203.	Plaintiffs further allege that Ofc. Lawrence was inadequately disciplined; that this inadequate discipline caused their constitutional injuries; and that BRPD and the Parish-City was deliberately indifferent to the constitutional rights injured.

204.	Plaintiffs further allege that Ofc. Lawrence's conduct has been authorized, approved, and ratified by Chief Murphy Paul, who wields final policymaking authority for BRPD in the relevant fields.

## COUNTS VI, VII, VIII, IX, X

### State Law Claims – Assault, Battery, False Imprisonment, Malicious Prosecution, Negligence

205.	Plaintiffs repeat and reallege all of the paragraphs in this complaint as if fully set forth herein.

206.	As more fully described above, plaintiffs assert state law claims against Ofc. Lawrence of assault (COUNT VI), battery (COUNT VII), false imprisonment (COUNT VIII), malicious prosecution (COUNT IX), and negligence (COUNT X) in violation of Louisiana law.

## COUNT XI

### Respondeat Superior

207.	At all relevant times, Ofc. Troy Lawrence Jr. was acting in the course and scope of employment as a Baton Rouge police officer and was under the control, direction, and supervision of his employers. Defendants BRPD and City/Parish of Baton Rouge are liable for the aforementioned state-law torts under the doctrine of respondeat superior.

208.	Plaintiffs have been injured by the foregoing, having suffered physical injuries, mental injuries, pain and suffering, medical expenses, and reputational harms.

WHEREFORE, Plaintiff prays that this Court enter judgment in her favor and against Defendants Troy Lawrence, Jr., Chief Murphy Paul, the Baton Rouge Police Department, Parish of East Baton Rouge, and the City of Baton Rouge. Plaintiff prays for the awarding of declaratory relief and compensatory damages, costs and attorneys' fees against all Defendants, and punitive damages against all Defendants; and for such further and additional relief as this Court may deem appropriate and just. A jury is demanded.

Respectfully submitted,

**SHONA CHAVIS, HOLDEN SANDERS,** and
**EMANUEL CHAVIS**

By: _____

Their attorney

Thomas W. Frampton (La. Bar No. 35775)
580 Massie Road
Charlottesville, VA 22903
(202) 352-8341
tframpton@law.virginia.edu