## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

SHONA CHAVIS, HOLDEN SANDERS,
and EMANUEL CHAVIS,

        Plaintiff,

   v.

TROY LAWRENCE, JR., in his personal
capacity, MURPHY PAUL, in his official
capacity, BATON ROUGE POLICE
DEPARTMENT, CITY OF BATON
ROUGE, and PARISH OF EAST BATON
ROUGE.

        Defendants.

No. 23-cv-1129-SDD-RLB

## PLAINTIFFS' RESPONSE IN OPPOSITION TO
## DEFENDANT TROY LAWRENCE JR.'S MOTION TO DISMISS

**COME NOW**, Plaintiffs, Shona Chavis, Holden Sanders, and Emanuel Chavis ("Plaintiffs"), who respectfully submit their Response in Opposition to Defendant Troy Lawrence Jr.'s Motion to Dismiss (Dkt. 34) as follows.

This Response proceeds in two parts. **First**, although Plaintiffs maintain that the body-worn camera footage in fact bolsters their claims on net, it explains why it would be improper to consider such evidence at the motion to dismiss stage. As they did previously in opposing the City-Parish's motion to dismiss, Plaintiffs object to the consideration of this footage at the motion-to-dismiss stage. Because it is unclear whether Defendant Troy Lawrence Jr. suggests he is entitled to qualified immunity accepting as true the allegations made in Plaintiffs' complaint, this may be the quickest way to dispose of the pending motion. **Second**, it explains why Troy Lawrence Jr.'s qualified immunity defense falls short, even if the footage is allowed to supplement the Complaint

at this stage. In tackling the qualified immunity question, this Memorandum begins with probable cause for arrest, then addresses excessive force, then moves to the First Amendment retaliation and malicious prosecution claims—an order slightly different than the claims are listed in the Complaint or addressed in Defendant's motion to dismiss, for reasons that will become clear as the argument proceeds. Finally, it addresses the state law claims and Defendant's "discretionary act immunity" claim.

To summarize, there was never probable cause to arrest either Emanuel or Holden; they had the right to resist (though it is not clear that either did so under Louisiana law); even if Ofc. Lawrence was effecting a lawful arrest, his force against all three Plaintiffs was excessive and unreasonable; and the Defendant's actions were improperly motivated by verbal criticism and conduct (filming) protected by the First Amendment. Finally, police officers violate the Fourth Amendment when they fabricate evidence and bring bogus charges against individuals like Plaintiffs; this legal right was "clearly established" at the time the misconduct in this case transpired. And Plaintiffs have validly stated each of their state law claims, to which no "discretionary act immunity" applies.

I.    **The Motion to Dismiss Should Be Evaluated Based Solely on the Allegations Contained in the Complaint**

In recent years, police brutality defendants within the Fifth Circuit have attempted to supplement their motions to dismiss with video footage that they consider to be favorable. *See, e.g., Ramos v. Taylor*, 646 F.Supp.3d 807 (W.D. Tex. 2022). Often, like Defendant Troy Lawrence, Jr., they claim (without source or citation) that "[t]he body-worn camera footage is the best evidence of those interactions." Dkt. 34-1, *3. In fact, the opposite is usually true. *See, e.g.,* Timothy Williams, et al., *Body Cameras: What Do You See?* N.Y. TIMES, Apr. 1, 2016, at https://www.nytimes.com/interactive/2016/04/01/us/police-bodycam-video.html                    (offering

interactive examples of misleading body-worn camera footage and discussing scholarly research demonstrating that body-worn cameras often reflect "deceptive intensity" and otherwise fail to show what bystander video more accurately reflects). And accordingly, as already discussed in Plaintiffs' opposition to the City-Parish's motion to dismiss, courts generally reject the admissibility of such footage at the motion-to-dismiss stage. *See* Dkt. 24, *8 (highlighting City-Parish's "serious lack of candor with the court" in representing the facts and holding of *Ramos v. Taylor*, 646 F.Supp.3d 807 (W.D. Tex. 2022) and other relevant case law).

Generally speaking, "[a] district court is limited to considering the contents of the pleadings and the attachments thereto when deciding a motion to dismiss," and *not* documents attached to a motion to dismiss. *Villarreal v. Wells Fargo Bank, N.A.*, 814 F.3d 763, 766 (5th Cir. 2016) (citing Fed. R. Civ. P. 12(b)(6) and *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000)); *see also Collins*, 224 F.3d at 498-99. But the Fifth Circuit has recognized a narrow exception to this rule. When a document is "central" to a plaintiff's case and is expressly referenced in the complaint (e.g., a notice of foreclosure, contract, or other financial document), the document itself may be considered insofar as it directly contradicts the allegations. *See, e.g., Villareal*, 814 F.3d at 766. If a Plaintiff's complaint contains factual allegations that are "qualified" by reference to an exhibit, but the exhibit unambiguously shows the opposite, it is "the exhibit and not the allegation [that] controls." *U.S. ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 377 (5th Cir. 2004). But "simply because a video that captured the events complained of in the complaint exists does not transform that video into a 'document' upon which the complaint is based." *Ambler v. Williamson Cnty., Texas*, No. 1-20-CV-1068-LY, 2021 WL 769667, at *3 (W.D. Tex. Feb. 25, 2021); *see also id.* at *4 ("[T]he Video captures only part of the underlying incident and merely 'provides one (1) officer's

3

perspective of the incident at issue.' While the Video may be central to Defendant's defense in this case, Defendant has failed to demonstrate that the Video is central to Plaintiffs' claims.") (cleaned up).[1]

     Dicta in the Fifth Circuit's recent decision in *Sligh* (which is not a case involving a challenge to considering such evidence) recites this uncontroversial and long-standing features of Fifth Circuit law; the Fifth Circuit did not cite any previous cases apart from the cases above (*Villarreal*, *Collins*, and *Riley*) and did not suggest it was altering or expanding these basic rules. *See Sligh v. City of Monroe, Texas*, 87 F.4th 290 (5th Cir. 2023). There, the Plaintiff's complaint "repeatedly reference[d] Sutton's bodycam footage," and apparently without objection from the plaintiff, the district court considered the footage in weighing Defendants' motion to dismiss. *Id.* at 296. The plaintiff argued to the district court and the Fifth Circuit that the courts should interpret the video footage differently, but apparently never argued that the footage was barred by Rule 12(b)(6) or Fifth Circuit precedent altogether. *See* Br. for Plaintiff-Appellant, *Sligh v. City of Conroe, Texas*, Case No. 22-40518 (5th Cir. 11/10/22), 2022 WL 17064424; Reply Br. for Plaintiff-Appellant, *Sligh v. City of Conroe, Texas*, Case No. 22-40518 (5th Cir. 2/1/23), 2023 WL 1868240. The *Sligh* court did not hold—as Defendant Troy Lawrence, Jr. now

---

[1]    Even at the summary judgment stage, when the district court *can and should* consider video evidence that Defendants seek to introduce to rebut the factual allegations of a complaint, it would be highly improper to reject a factual allegation based on video footage alone. "[T]he standard imposed by the Supreme Court is a demanding one: a court should not discount the nonmoving party's story unless the video evidence provides so much clarity that a reasonable jury could not believe his account." *Darden v. City of Ft. Worth, Texas*, 880 F.3d 722, 730 (5th Cir. 2018). The video must "blatantly contradict" the Plaintiff's factual allegations to be credited, even at the summary judgment stage. *Craig v. Martin*, 49 F.4th 404, 409 (5th Cir. 2022). Defendant's position that the video controls all else at this stage is at war with the longstanding and basic rule that "[a]ll questions of fact and any ambiguities in the controlling substantive law must be resolved in the plaintiff's favor" when weighing a Rule 12(b)(6) motion to dismiss. *Lewis v. Fresne*, 252 F.3d 352, 357 (5th Cir. 2001).

suggests—that a district court may or must consider body-worn camera footage when assessing a

Rule 12(b)(6) motion to dismiss whenever a defendant believes such footage may help them in a

police brutality case, or when the Complaint contains screenshots from the footage.

The foregoing helps explain some misleading representations in Defendant's motion to

dismiss. For instance, Defendant claims that "Plaintiffs purport to describe in their Complaint the

audio and video that is depicted on Officer Lawernce's [sic] body-worn camera," citing forty-one

different paragraphs of the Complaint, and Defendant claims that "Plaintiffs have embedded 14

screenshots from Office Lawrence's body-worn camera into their Complaint." *See* Dkt 34-1, *3.

But the Complaint does *not* purport to describe the contents of the footage (with one small

exception).[2] There is a critical (and, in this case, dispositive) difference between making a factual

allegation as to the contents of body-worn camera footage and making a factual allegation as to

what happened. Plaintiffs' Complaint makes factual allegations as to *what actually happened*; if

the Complaint were making factual allegations as to the contents of body-worn camera footage,

the footage would be admissible and would "control" on that point. *Riley*, 355 F.3d at 377.[3]

---

[2]    Plaintiff concedes that ¶ 11 of the Complaint (alleging: "Within twelve (12) seconds of
turning on his body-worn camera, Ofc. Lawrence *can be heard* cursing") (emphasis added)
constitutes a factual allegation as to the contents of an audio-recording. It is a true allegation and
Defendant does not dispute its veracity. The other factual allegations contained in the complaint
are worded differently: they are allegations about *what happened*, not about *what the body-worn
camera footage depicts.*

[3]    To illustrate this distinction, the Complaint also makes a series of factual allegations
about the false police report that Ofc. Troy Lawrence, Jr. authored in this case. *See, e.g.,* Compl.,
¶ 70 (alleging police report ran 1,072 words long); Compl., ¶ 74 (alleging "The report omits Ofc.
Lawrence's role in provoking violence and escalating the situation"); Compl., ¶ 75 (alleging
"The report falsely states that the non-BRPD officers who refused to assist Ofc. Lawrence
brutalizing Holden were 'obliviously engaged in a verbal conversation nearby and unaware that
he needed assistance.'"). If, at the motion to dismiss stage, Ofc. Troy Lawrence Jr. wanted to
introduce a copy of the report to show that it was *not* 1,072 words long, that it in fact *included* an
account of Ofc. Lawrence's role in provoking the violence, or that it *did not contain* the
statements about the other officers being "obliviously engaged in a verbal conversation nearby,"
Fifth Circuit precedent would permit him to do so. The foregoing are examples of factual

Moreover, it is incorrect that the Complaint contains 14 stills from Officer Lawrence's body-worn camera footage. One of the stills that is contained in the complaint actually shows Defendant's violent attack on Plaintiff from a different camera and a different angle, precisely because the Defendant's body-worn camera footage fails to accurately depict the entire encounter.  Defendant's misrepresentation is curious because (1) it is obvious from the still itself that the image could not have been captured by Ofc. Lawrence's body-worn camera, and (2) Plaintiffs already emphasized this fact in responding to the City-Parish's motion to dismiss. *See* Dkt. 24, *8 n.2 ("[O]ther images [in the Complaint] are from other video angles because the BWC does not depict the full incident (and, of course, it only shows the incident from Troy Lawrence Jr.'s perspective). For example, the image on page 11 that shows Troy Lawrence Jr. clawing his hand into the back of Holden's neck is not visible from the BWC footage, but it is clear from the alternate angles.")). Plaintiffs' illustrative use of footage from multiple cameras and angles in the Complaint is intentional, because a single body-worn camera angle in no way, shape, or form fairly illustrates/proves/disproves all that Plaintiffs allege to be true in their complaint.

\* \* \*

If the foregoing is incorrect, Plaintiffs pray for leave to file an amended complaint, which will omit the screenshots and any reference to the body-worn camera. That way, the Court can properly evaluate the sufficiency of Plaintiffs' factual allegations based solely on the factual

---

allegations contained in a complaint that are qualified by reference to the extrinsic evidence itself, and so if there were a contradiction between the complaint's factual allegations and the documents, the documents would control. Fifth Circuit precedent does *not* provide that, because a Complaint references body-worn camera footage (which, like a report, may also offer a depiction of the encounter from Ofc. Lawrence's perspective), that referenced material is necessarily admissible for all purposes when evaluating his motion to dismiss.

allegations contained in the pleadings, as Rule 12(b)(6) contemplates. And the Court will have access to *all* the video footage—not to mention sworn testimony from the other law enforcement officers who witnessed Ofc. Lawrence's rampage first-hand—before deciding if qualified immunity is warranted at the summary judgment stage, as Rule 56 contemplates.

Alternatively, if the court were to consider the video footage, such a decision would implicitly convert Defendant's motion to dismiss into a motion for summary judgment: Plaintiffs "must have at least ten days' notice before the court's ruling" to submit declarations, records, and other evidence in rebuttal. *Hodge v. Engleman*, slip op. at *5-*6, No. 22-11210 (5th Cir. 2024).

## II. Even Considering the Video Footage, Troy Lawrence, Jr. Has Not Shown That He Is Entitled to Qualified Immunity

All of the foregoing is a red herring, however, because Plaintiff does not identify a single factual claim in Plaintiff's complaint that the body-worn camera footage "utterly discredits" or "blatantly contradicts." *Darden*, 880 F.3d at 729; *Craig*, 49 F.4th at 409. And even accepting the video as the exclusive and authoritative account of what transpired that day, Plaintiffs have still stated valid claims and are entitled to move past the Rule 12(b)(6) stage.

### A. Emanuel Chavis and Holden Sanders Unlawful Seizure (Count II)

Defendant argues that he is entitled to qualified immunity regarding Emanuel Chavis and Holden Sanders's Fourth Amendment unlawful seizure claim for two reasons: (1) "As indicated above, Officer Lawrence clearly had probable cause to arrest Mr. Sanders and Mr. Chavis for disturbing the peace . . . pursuant to La. R.S. La. R.S. [sic] 14:103(A)(2)," and (2) "In addition, the video from the body-worn camera clearly and unequivocally shows that Mr. Sanders and Mr. Chavis actively resisted Officer Lawrence when he attempted to arrest them," thus providing

probable cause to arrest under a different statute. Dkt. 34-1, at *10. These two arguments both fail; they are addressed in turn.

### 1.  There Was No Probable Cause to Arrest for a Violation of La. R.S. 14:103(A)(2)

Defendant argues that the factual allegations set forth in Paragraphs 6 and 10 of the complaint establish probable cause to arrest Plaintiffs Emanuel Chavis and Holden Sanders. *See* Dkt. 34-1, at *9. The allegations are that "On October 8, 2022, family members of Malik Chavis rushed to Our Land of the Lake Hospital" and that "Ofc. Lawrence overheard a verbal argument between brothers Holden Sanders and another family member" that took place approximately "100 yards from the front entrance of the hospital." *See* Compl. ¶¶ 6, 8. Neither the Complaint nor the video identifies how far from the entrance of the hospital Ofc. Lawrence was when he overheard the verbal argument, nor does it provide any information as to what was said, who said what, how loud the argument was, how long it lasted, whether profanity was used, who was involved in the argument (other than Holden Sanders), or whether other members of the public were nearby.

Nothing in the foregoing provides even the slightest basis for establishing probable cause for the arrest of Emanuel Chavis. The complaint does not allege that he was a party to the verbal argument. In fact, the verbal argument was between Holden Sanders and a different family member, not Emanuel Chavis. *Cf. Ybarra v. Illinois*, 444 U.S. 85, 86 (1979) ("A person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person.").

Nor does the foregoing establish probable cause for the arrest of Holden Sanders. True, La. R.S. 14:103(A)(2), at first blush, appears to make it a criminal offense to "annoy" someone in public; but as the U.S. Supreme Court and Louisiana courts have repeatedly ruled over the

past half-century, the only way La. R.S. 14:103(A)(2) could be consistent with the First Amendment is if it is narrowly construed. *See Garner v. Louisiana*, 368 U.S. 157 (1961) (limiting scope of La. R.S. 14:103); *Lewis v. City of New Orleans*, 415 U.S. 130 (1974); *City of New Orleans v. Lyons*, 342 So.2d 196 (La. 1977). The Louisiana courts' longstanding interpretation of La. R.S. 14:103 makes clear that "[o]nly fighting words—those which by their very utterance inflict injury and tend to incite an immediate breach of the peace, are punishable" under the statute. *State v. Woolverton*, 474 So. 2d 1003, 1005 (La. App. 5th Cir. 1985); *see also State v. Heck*, 307 So.2d 332 (La. 1975) (explaining that the proviso "in such a manner as would foreseeably disturb or alarm the public" serves as a "restrictive" clause that "limits" the reach of La. R.S. 14:103(A)(1)). Thus, for example, a Louisiana police officer does not have probable cause to arrest a citizen under La. R.S. 14:103(A)(2) for: angrily stating in public, "Get that God damned [mother fucker] out of my eyes." *Norrell v. City of Monroe*, 375 So. 2d 159, 160 (La. App. 2d Cir. 1979); or for calling someone a "God Damned white Mother Fucker," *State in Interest of W.B.*, 461 So. 2d 366, 368 (La. App. 2d Cir. 1984); or for using the phrase "mother fucker" and directing the word "damn" at one's wife, *State v. McCoy*, 546 So. 2d 240, 243 (La. App. 2d Cir. 1989); or for approaching others in "a loud, excited and boisterous manner," *State v. Chauvin*, 945 So. 2d 752, 761 (La. App. 5th Cir. 2006) (rejecting probable cause where evidence was "lacking in regards to the words used by defendant"). Neither the Complaint nor the Defendant suggests that anyone involved in the "verbal argument" used "fighting words" or otherwise engaged in conduct that would provide probable cause for arrest.

Conspicuously, Defendant does not cite a single Louisiana case involving La. R.S. 14:103(A)(2). Doing so would require him to compare the facts of that case to the ones here, and of course, no Louisiana court has ever suggested that it is a crime to engage in a "verbal

argument" in public. To the extent there is some ambiguity in the record, it must be resolved in

Plaintiffs' favor. *Lewis v. Fresne*, 252 F.3d 352, 357 (5th Cir. 2001).[4]

> **2.    There Was No Probable Cause to Arrest for Resisting an Officer Pursuant to La. R.S. 14:108(B)(2).**

Defendant's discussion of La. R.S. 14:108(B)(2) misleadingly suggests that this statute

might provide some *independent* basis to defeat Plaintiff's Fourth Amendment claims. It omits

an important feature of Louisiana law: Louisiana citizens enjoy a robust right to aggressively and

forcefully resist an arrest that is attempted without probable cause (and Louisiana's courts have

taken pain to emphasize that La. R.S. 14:108(B)(2) must be interpreted accordingly). *Adams v.*

*Thompson*, 557 F. Supp. 405, 411 (M.D. La. 1983) ("[Plaintiff's] resistance, even physical

resistance, to the trooper's unlawful arrest cannot provide probable cause for her arrest [under La.

R.S. § 14:103]").

 Most of the landmark cases on this issue involve arrestees who fought back against

unjustified arrests purportedly justified by the arrestee's "disorderly conduct" or "disturbing the

peace." As the Louisiana Supreme Court explained in *State v. Lindsay*, 388 So.2d 781 (La.

1980):

> It is a long-established principle in Louisiana law that a citizen has the right to resist
> an unlawful arrest. *White v. Morris*, 345 So.2d 461 (La.1977); *City of New Orleans*
> *v. Lyons*, 342 So.2d 196 (La.1977); *State v. Lopez*, 235 So.2d 394 (La.1970); *City*

---

[4]    The argument contained in Defendant Troy Lawrence Jr.'s motion to dismiss is
particularly terrifying when taken together with the argument contained in the City-Parish's
motion to dismiss recently filed in a related "BRAVE Cave" (which insists that the Fourth
Amendment allows BRPD officers generally, and Officer Lawrence Jr. in particular, to engage in
an invasive and sexually humiliating strip-search of a citizen any time there is *reasonable*
*suspicion* to believe that a non-arrestee has violated a criminal statute like La. R.S.
14:103(A)(2)). *See* Mot. to Dismiss, Dkt. 19-2, *10, *Brown v. BRPD*, No. 23-cv-1313-JWD-
EWD (defending lawfulness of Ofc. Troy Lawrence Jr.'s strip search). Baton Rouge is not yet a
police state: one can still argue in public (or, as in the case of Emanuel, observe two other people
who are arguing in public) without being subject to a forcible arrest and humiliating strip search.

*of Monroe v. Ducas*, 203 La. 974, 14 So.2d 781 (1943); La. R.S. 14:108; C.Cr.P. art. 220. As was stated in a 1943 opinion, *Monroe v. Ducas* . . . :

> The right of personal liberty is one of the fundamental rights guaranteed to every citizen, and any unlawful interference with it may be resisted. Every person has a right to resist an unlawful arrest; and, in preventing such illegal restraint of his liberty, he may use such force as may be necessary." 14 So.2d at 784.

In a more recent opinion, we reaffirmed the right to resist an unlawful arrest, and concluded its basis is found in statutory law (R.S. 14:108, resisting an officer, supra, speaks of a lawful arrest; C.Cr.P. art. 220 requires a "person . . . submit peacefully to a lawful arrest"), *White v. Morris*, supra, although there has been some suggestion that the right is constitutionally mandated as well. See *Wainwright v. New Orleans*, 392 U.S. 598 (1968) (Douglas, J., dissenting) (Writ of Certiorari dismissed as improvidently granted due to inadequacy of record); *White v. Morris*, supra; *State v. Lopez*, supra.

> The sole question presented in this case is whether lawful grounds existed to arrest defendant. If not, then his conviction of resisting an officer in violation of R.S. 14:108 must be reversed because defendant's resistance of his arrest would have been an exercise of his right to resist an unlawful arrest. . . .

*State v. Lindsay*, 388 So. 2d 781, 782–83 (La. 1980). There is no probable cause for arrest under La. R.S. 14:108 if the officer is not "authorized by law to make a lawful arrest." *Adams v. Thompson*, 557 F. Supp. 405, 410 (M.D. La. 1983) ("Louisiana jurisprudence has restricted the application of § 108 to its statutory language and, if the officer is not engaged in one of the three stated activities, namely, attempting to seize property, serving process, or making a lawful arrest, then a person who opposes him can not be guilty of a violation of § 108."). Based on the Complaint here—even when "supplemented" by the video—Ofc. Lawrence was not authorized by statute to make a "lawful arrest" of either Emanuel or Holden.[5]

---

[5]    Moreover, without citation to the Complaint or specific passages of the video—or citations to Louisiana law—Defendant states that it is "clear" that both Mr. Sanders and Mr. Chavis resisted. But it is not stated how Defendant reaches this conclusion (or what specific acts Defendant believes the video "clear[ly]" shows that might constitute resistance under La. R.S. § 14:108(B)(2)). For example, the video depicts forms of verbal opposition to Office Lawrence. But "Louisiana jurisprudence consistently holds that where § 108 is applicable, verbal opposition to an officer, even abusive language and cursing, does not constitute the 'opposition' and

**B.  Emanuel Chavis and Holden Sanders Excessive Force (Count III)**

Defendant moves to dismiss Emanuel and Holden's excessive force claims based on the following:

> In the present case, the video evidence shows that Mr. Sanders and Mr. Chavis were actively resisting arrest. The amount of force used was no more than that needed to effectuate their arrest . . .  Because Officer Lawrence used no more force than was necessary to overcome the resistance of Plaintiffs in effectuating a lawful arrest, his use of force was reasonable and does not rise to the level of a constitutional violation. Thus, Officer Lawrence is entitled to qualified immunity.

Dkt. 34-1, *12-*13. Two threshold points bear emphasis: (1) 100% of Defendant's argument is based on what "the video evidence shows" (as opposed to the factual allegations contained in the Complaint); and (2) 100% of Defendant's argument is based on the erroneous claim that he was "effectuating a lawful arrest." Thus, if this Court concludes that Plaintiffs are right with respect to *either* the admissibility of the video at this stage *or* the foregoing argument that Officer Lawrence lacked probable cause to "effectuate a lawful arrest" based on either La. R.S. 14:103 or La. R.S. 14:108, Defendant's motion to dismiss the excessive force claims is dead on arrival.

But even if this court *agrees* with Defendant on the previous two points—agreeing to review the video, and accepting that it conclusively establishes probable cause to arrest both men for disturbing the peace—Emanuel and Holden's excessive force claims should survive. Plaintiffs allege that Troy Lawrence Jr. used unreasonable force "when he grabbed, pushed, punched, choked, excessively tightened handcuffs, and refused to loosen handcuffs." Compl. ¶

---

'obstruction' proscribed by § 108. *Adams v. Thompson*, 557 F. Supp. 405, 410 (M.D. La. 1983) (citing *White v. Morris,* 345 So.2d 461 (La. 1977); *Norrell v. City of Monroe,* 375 So.2d 159 (La. Ct. App. 1979); *Malone v. Fields,* 335 So.2d 538 (La. Ct. App. 1976)). And Holden went out of his way—even while being grabbed, pulled, choked, and having his hair yanked—to emphasize that he was *not* going to strike or "put hands on" Defendant. Perhaps Defendant is suggesting that Emanuel's filming of his brutality was a form of illegal "resistance"? It is hard to see how else Emanuel might have resisted. We must guess: the motion to dismiss and the supporting memorandum are silent.

193. Nowhere in Defendant's lengthy filing does he deny that he did any of the foregoing, nor does Defendant explain why such force was necessary. Defendant ignores the fact that Plaintiffs allege it was *not* remotely necessarily, and in fact, both readily submitted to an oral request to cooperate once such a request was issued clearly by a non-dangerously-enraged law enforcement officer. Defendant also ignores that the violent interaction began not with an attempt to effectuate an arrest, but when (according to the Defendant's *own* self-serving account of the incident):

> Ofc. Lawrence explained that he first used force against Holden to push him into the car because "they wanted to still mouth off . . . so at that point, I'm going to force y'all inside y'all's car.

Compl. ¶ 61. Defendant offers no suggestion that anything in the Fourth Amendment authorizes an officer "to force y'all inside y'all's car" because they were talking "too much"; such force is unreasonable.

The arrest of both Holden and Emanuel was unnecessarily violent: as the Complaint alleges, "As soon as Ofc. Lawrence moved back received assurances he would not be brutalized further, Holden stepped out of the vehicle peacefully. Holden complied with the non-violent sheriff's deputy in a matter of seconds after the deputy successfully asked Ofc. Lawrence to step back." Compl. ¶¶ 46-47. The Complaint further alleges that Ofc. Lawrence never once communicated that he was placing Plaintiffs under arrest. An appropriate amount of force would have been to verbally ask them to step out of the car and submit to arrest. Instead, *without* stating that Plaintiffs were under arrest, Ofc. Lawrence simply went on a violent rampage, first trying to force one of them *into* a car, then seeking to drag one of them out. Defendant seems to suggest that his own brutality is dispositive evidence of the necessity of his unreasonable force, but this is not so.

13

One strong indicium of whether Defendant's use of force was reasonable in the moment—as properly alleged in the Complaint—was the reaction of other reasonable law enforcement officials who watched his violent temper-tantrum from mere feet away and refused to assist him (despite his profane calls for help), and then Defendant's sworn false statements to conceal this fact. *See, e.g.,* Compl. ¶ 40-42 ("Approximately 30 seconds after first yelling 'CAN Y'ALL FUCKING HELP?!', Ofc. Lawrence again addressed the other officers, this time stating: 'WHAT THE FUCK ARE Y'ALL DOING?! YOU'RE NOT GOING TO HELP?!' In a sworn police report, Ofc. Lawrence wrote that the other officers had not come to his assistance initially because they were 'obliviously engaged in a verbal conversation nearby and unaware that I needed assistance.' This statement was false."). A logical inference that can be drawn from this factual allegation is that the other law enforcement officers witnessing the outburst—whose perspective was at least as good as that of a body-worn camera—viewed Ofc. Lawrence to be using unreasonable force.

And Defendant simply ignores the centerpiece of Emanuel's excessive force claim, which focuses on Defendant's cruel and sadistic use of handcuffs to intentionally inflict pain on Emanuel. See Compl. ¶¶ 54-60, 85 ("Emanuel experienced acute pain from Ofc. Lawrence's decision to place the handcuffs on him tightly. When first placed in cuffs, he complained, 'He hurting me! He hurting my arm! . . . Man, call the Sergeant out here, man!' Ten minutes later, Emanuel again asked for his handcuffs to be loosened. Eight minutes after that, Emanuel again explained, 'I can't feel my hands right now' and explained that the handcuffs are 'Cutting off my circulation right now.' Ofc. Lawrence was subjectively aware that Emanuel was complaining of pain. Ofc. Lawrence heard all of Emanuel's complaints and had the opportunity to loosen the cuffs, but chose not to do so. When Emanuel complained about the handcuffs, he responded:

'Well, whenever you fight with me . . . that's what happens.' . . . Emanuel has continuing pain in his wrists; he is unable to pick up his child with one hand as a result of injuries Ofc. Lawrence inflicted."). Defendant has not addressed these allegations, but if he did, he would not be entitled to qualified immunity. *See Heitschmidt v. City of Houston*, 161 F.3d 834, 840 (5th Cir. 1998) (rejecting qualified immunity for Fourth Amendment claim based on pain inflicted as a result of overly tight handcuffs); *Dormu v. District of Columbia*, 795 F. Supp. 2d 7, 23 (D.D.C. 2011) (rejecting qualified immunity, despite absence of on-point previous D.C. Circuit precedent, citing an overwhelming consensus from courts of appeals like the Fifth Circuit that "an individual had a clearly established right to be free from a police officer's injury-inducing application of handcuffs after the individual complained that the cuffs were too tight").

### C.  Shona Chavis Excessive Force (Count III)

The entirety of Defendant's argument to dismiss Shona Chavis's excessive force claim is as follows: "With respect to Ms. Chavis, the video shows that she was actively interfering with Officer Lawrence's ability to effectuate the arrest and that all Officer Lawrence did was simply use his arm to move her out of the way." Dkt. 34-1, *12. Once again, Defendant's motion to dismiss Ms. Chavis's claims are predicated on this Court accepting *both* antecedent arguments: (1) that this Court should evaluate Ofc. Lawrence's body-worn camera footage when assessing the Defendant's motion to dismiss, and (2) Ofc. Lawrence had lawful authority to use force and violence against Ms. Chavis's children. If the Court rejects *either* argument, it may dispense with the argument there.

But even if the Court agrees to review the video and accepts that there was probable cause to arrest Emanuel and Holden, once again, it does not follow that he is entitled to qualified immunity as to Ms. Chavis's claims. Defendant ignores the actual allegations contained in the

Complaint. Ms. Chavis alleges the following in support of her excessive force claim: "Scared that she was about to watch the lynching of her son, Ms. Shona Chavis attempted to calm Ofc. Lawrence down. Ofc. Lawrence struck Ms. Chavis multiple times with his hand." Compl. ¶ 34-35. "Months later, Shona Chavis continues to suffer from serious pain in her shoulder from where Ofc. Lawrence struck her." Compl. ¶ 84. Additional factual allegations in the complaint provide more insight into Defendant's state of mind and aggressive hostility toward Ms. Chavis. For example, "[a]fter Shona Chavis explained that Ofc. Lawrence was still acting in an 'unprofessional' manner, he rolled up the window of his police car and stated, 'Shit!'" Compl. ¶ 63. *See also* Compl. 79 ("The report omits any mention of Ofc. Lawrence's use of force against Shona Chavis or the other citizen Ofc. Lawrence shoved.").

Importantly, Defendant does not argue that any of the foregoing is *untrue* or *contradicted* by the video evidence. He just claims that the video doesn't show it all. And in that regard, Plaintiffs and the Defendant agree: the body-worn camera does not fully show everything that did or did not transpire between Defendant and Ms. Chavis. That's because Ofc. Lawrence's violent temper tantrum was chaotic, and accordingly, the body-worn camera affixed to his chest during this incident does not clearly depict the entirety of his interaction with Ms. Chavis. It is the perfect example of why this Court should not rely on Defendant's exhibit to resolve at the motion to dismiss stage such a fact-bound question, without seeing other video footage and receiving sworn testimony from others (including other law enforcement eyewitnesses) who will support Ms. Chavis's version of events.

### D.    First Amendment Retaliation, All Three Plaintiffs (Count I)

The entirety of Defendant's motion to dismiss Shona Chavis's First Amendment claim is the following: "In the present case, there is no allegation that Ms. Chavis was arrested. Thus,

there is no causation between any exercise of Ms. Chavis' First Amendment rights and any injury that she allegedly suffered." Dkt. 34-1, *9. The fact that she was just struck, as opposed to arrested, is not fatal to her First Amendment claim. To be clear, Ms. Chavis alleges Ofc. Lawrence repeatedly struck her because she sought to calm him, Compl. ¶ 34-35, and just like other women "who (correctly) told him he was acting impressionably," Compl. ¶ 107, she paid a physical price. *See* Compl. ¶ 84 ("Months later, Shona Chavis continues to suffer from serious pain in her shoulder from where Ofc. Lawrence struck her.").

As to Holden and Emanuel, Defendant's entire argument is (yet again) that "[b]ecause both probable cause and arguable probable cause existed, Officer Lawrence should be 'exonerated' from liability with respect to Plaintiffs' First Amendment retaliation claims." Dkt. 34-1, *10. As explained earlier, there was no probable cause for anything Officer Lawrence did that day.

But once again, even this Court disagrees and holds that Ofc. Lawrence had probable cause to arrest Emanuel and Holden for "disturbing the peace," Plaintiffs have still stated valid First Amendment claims. As the U.S. Supreme Court made clear in *Nieves* (and the Fifth Circuit has subsequently recognized), the "no-probable-cause-requirement" does "not apply when a plaintiff presents objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1727 (2019); *Roy v. City of Monroe*, 950 F.3d 245, 255 n.4 (5th Cir. 2020). Plaintiffs have done just that here: ironically, Defendant's misreading of the Complaint—the erroneous assumption that Emanuel Chavis was the other family member involved in the "verbal argument"—highlights the point. The Complaint alleges that there was an identically situated family member who engaged in precisely the same conduct as Defendant, but this individual was

17

not arrested. Additionally, the Complaint references another "striking[ly]" similar recent First Amendment lawsuit brought against Ofc. Troy Lawrence Jr. where the City-Parish ended up paying $55,000 to settle claims against Defendant: as in this case, Defendant argued that he had probable cause to arrest one motorist for "disturbing the peace" after a verbal argument, but conspicuously chose not to arrest the other motorists involved in the verbal argument who did not criticize him. Compl. ¶¶ 107-127; *see also* Compl., *Reed v. Lawrence*, No. 21-CV-624-JWD-RLB.

Why did this other family member not end up arrested and brutalized like Holden and Emanuel? Officer Lawrence's own words (which Defendant does not dispute the body-worn camera accurately captures) provide the answer: he didn't like the protected speech Plaintiffs directed at him. See Compl. ¶¶ 13-18 ("While dispersing, Emanuel criticized Ofc. Lawrence's professional and attitude, stating that Ofc. Lawrence was "doing too much." Rather than ignore the criticism, Ofc. Lawrence again used profanity: 'I'm doing too much? Okay. Get the fuck [out of here].' Holden, still moving to get into his car, asked Ofc. Lawrence to 'stop talking to us like that.' Within eight seconds of Holden's request that Ofc. Lawrence 'stop talking to us like that,' Ofc. Lawrence rapidly approached Holden stating, 'Whatcha going to do?! Whatcha going to do?!' and began grabbing him by the wrist.") If that weren't enough, Defendant later admitted to Ms. Chavis that it was Plaintiffs' speech that prompted him to arrest, rather than disperse, them. Compl. ¶¶ 61-62 ("Ofc. Lawrence explained that he first used force against Holden to push him into the car because "they wanted to still mouth off . . . so at that point, I'm going to force y'all inside y'all's car. Ofc. Lawrence explained that his decision to arrest Holden and Emanuel was motivated in part because they were 'saying extra stuff that didn't need to be said.'").

Defendant also ignores that the Complaint alleges Emanuel was arrested, in part, because he filmed Ofc. Lawrence engaged in police brutality. The Complaint alleges (and the body-worn camera confirms) that other people were present in addition to Emanuel, but what set Emanuel apart was that he was filming Defendant's misconduct. Compl. ¶¶ 48-60, 186. Defendant does not deny this.

Defendant also inappropriately conflates cases that come before courts at the summary judgment stage (like *Nieves* and *Roy*) and the motion to dismiss stage (like this one). If Defendant wants to contend that he arrests everyone he encounters where there is probable cause to believe they have engaged in a minor offense like "disturbing the peace" (regardless of whether they engage in protected First Amendment activity) he is entitled to do so. But such a claim strains credulity, and Plaintiffs should have the opportunity in discovery to inquire into whether such an improbable claim is true. On information and belief, there are *many* other "similarly situated" individuals (beyond the several ones identified in the Complaint) who Defendant has not arrested except for the fact that they (accurately) criticized him. And the complaint alleges that the Defendant *himself* has engaged in a manner that would plainly violate La. R.S. 14:103 himself, but presumably, he has never arrested himself. *See* Compl. ¶¶ 128-139 (discussing disciplinary action, but not arrest, for Defendant's verbal arguments in public with colleagues). Plaintiffs' pleading properly alleges more than enough.

### E.    Emanuel Chavis and Holden Sanders Malicious Prosecution (Count IV)

Defendant's motion to dismiss the Plaintiffs' malicious prosecution claim largely reiterates the previous probable cause argument. It fails for reasons previously articulated.

It also fails for many other reasons. Contrary to Defendant's suggestion, it was "clearly established" within the Fifth Circuit that a police officer could engage in "malicious prosecution"

in violation of the U.S. Constitution long before *Thompson v. Clark*, 142 S.Ct. 1332 (2022). "Freestanding" malicious prosecution claims were a different matter, but malicious prosecution claims attached to a claim of false arrest were always cognizable. For example, in *Winfrey v. Rogers*, 901 F.3d 483, 493 (5th Cir. 2018), the Fifth Circuit recognized the existence of a malicious prosecution claim under the Fourth Amendment. *See also Payton v. Town of Maringouin*, No. 21-30440, 2022 WL 3097846, at *3 (5th Cir. Aug. 3, 2022) (explaining that, although *Castellano v. Fragozo* rejected a "freestanding" constitutional malicious prosecution claim, such claims could still be brought between 2003-2021 where the Plaintiff had been seized and arrested).

In any event, freestanding or otherwise, the U.S. Supreme Court clearly established the relevant right at least by April 4, 2022, well before Ofc. Lawrence initiated baseless criminal proceedings against Plaintiffs here on October 8, 2022. Without any further explanation, Defendant suggests that *Armstrong v. Ashley* (decided February 15, 2023) somehow muddied the water, or left the matter "unclear" in the Fifth Circuit. But this is nonsense. Indeed, the *Armstrong* court itself referred to "*Thompson's* clear recognition of the constitutional tort of malicious prosecution," 60 F.4th at 279, and recognized that the relevant question was whether such a constitutional claim was "cognizable in the Fifth Circuit" at "the time suit was filed," *id.* at 267. It was here. Neither the Fifth Circuit nor any district court within the Fifth Circuit (as far as Plaintiffs are aware) have continued to shield police officers like Officer Lawrence with qualified immunity for malicious prosecutions instituted post-April 4, 2022. Indeed, Defendant claims that "the contours of such a [malicious prosecution] claim are [still] currently unclear in the Fifth Circuit," so a BRPD officer who engaged in precisely the same unconstitutional conduct *tomorrow* would still dodge liability. Dkt. 34-1, *14. This Court should forcefully reject

20

that argument. After the U.S. Supreme Court's decision in *Thompson v. Clark*—"a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment," *District of Columbia v. Wesby*, 583 U.S. 48, 64 (2018)—Officer Lawrence could not have thought that he was acting consistent with the U.S. Constitution when he caused a criminal case to be brought against Holden and Emanuel, without probable cause, maliciously, where such case terminated in defendants' favor and caused damages. *See Gordy v. Burns*, 294 F.3d 722, 725 (5th Cir. 2002).

### F.    All Plaintiffs' State Law Claims (Counts VI-X)

After acknowledging that it is the factual allegations that control—not "labels" or "conclusions"—Defendant makes the remarkable claim that none of the factual allegations contained anywhere in the complaint establish any "assaults," "batteries," "false imprisonments," "malicious prosecutions," or "negligence" under state law. Dkt. 34-1, *14-*15. This argument is frivolous.

All three plaintiffs allege that Ofc. Lawrence committed a battery against them. Under Louisiana law, a battery "is a harmful or offensive contact with a person resulting from an act intended to cause the plaintiff to suffer the contact." § 12:6. Battery, 12 LA. CIV. L. TREATISE, TORT LAW § 12:6 (2d ed. 2023). The Complaint alleges Defendant "grabbed" Holden's wrist, Compl. ¶ 19, "shove[d] Emanuel," Compl. ¶ 22, "shoved Holden into the car," Compl. ¶ 25, "struck Ms. Chavis multiple times with his hand,"  Compl. ¶ 34, "choke[d] him [Holden] by the neck and grab him by his hair," Compl. ¶ 35, and tightly affixed handcuffs to Emanuel's wrists, causing acute pain, Compl. ¶¶ 54-57. It alleges much more. What more does Defendant want?

All three plaintiffs allege that Ofc. Lawrence committed assault against them. Under Louisiana law, assault "is an intentional act that creates an apprehension in the plaintiff of a

harmful or offensive contact." § 12:7. Assault, 12 La. Civ. L. Treatise, Tort Law § 12:7 (2d ed.).

Again, the Complaint is replete with allegations that Defendant both *threatened* unlawful and

*used* unlawful force against Plaintiffs. *See, e.g.,* Compl. ¶ 13-29 (discussing numerous profane

threats issued by Officer Lawrence). It expressly states that Holden feared Defendant "would . . .

brutalize him further," Compl. ¶  46, and that Emanuel begged Defendant to *stop* hurting him

further, Compl. ¶¶ 54-60. It is a fair inference that if a woman is struck repeatedly by a police

officer while thinking that she was "about to watch the lynching of her son," Compl. ¶ 33, that

she too is momentarily in fear of receiving another battery. Further, the assault allegations are

supported by the allegations that Defendant did, in fact, "grabbed" Holden's wrist,  Compl. ¶ 19,

"shove[d] Emanuel," Compl. ¶ 22, "shoved Holden into the car," Compl. ¶ 25, "struck Ms.

Chavis multiple times with his hand,"  Compl. ¶ 34, "choke[d] him [Holden] by the neck and

grab him by his hair," Compl. ¶ 35, and tightly affixed handcuffs to Emanuel's wrists, causing

acute pain, Compl. ¶¶ 54-57. Ofc. Lawrence's violence made Plaintiffs fear for their lives and

the lives of their loved ones. Each plaintiff has adequately stated a state tort law claim for

"assault."

> Under Louisiana law, a false imprisonment requires:
>
> a defendant's restriction of the victim's freedom of movement and that the plaintiff
> was aware that his freedom of movement was in fact restricted. The restriction must
> be a physical confinement. The restriction may result from the assertion of legal
> authority over the plaintiff by another who takes plaintiff into custody. The act of
> restraint need not be accompanied by malice. False arrest may result in false
> imprisonment if the arrest is made without proper authority.

§ 12:9. False imprisonment, 12 La. Civ. L. Treatise, Tort Law § 12:9 (2d ed.). Ms. Chavis

obviously does not allege that she was falsely imprisoned; the other two Plaintiffs do.

Defendants' suggestion that *none* of the plaintiffs have stated a valid claim of false imprisonment

is frivolous. The same is true for malicious prosecution: obviously the complaint does not allege

that Shona Chavis was maliciously prosecuted, but it certainly alleges facts that meet the elements of malicious prosecution under state law. *Id.* at § 12:17. Malicious prosecution and abuse of process. ("A claim for malicious prosecution requires the commencement of a criminal or civil proceeding, the causation of that proceeding by the present defendant, the termination of that proceeding in favor of the present plaintiff, absence of probable cause, the presence of malice, and damage."); *Armstrong v. Ashley*, 60 F.4th 262, 279 (5th Cir. 2023) ("the elements of the state-law tort of malicious prosecution and the elements of the constitutional tort of 'Fourth Amendment malicious prosecution' are coextensive.").

Under Louisiana law, liability attaches for negligence where (1) the defendant has a duty to conform his or her conduct to a specific standard of care (the duty element); (2) the defendant fails to conform his or her conduct to the appropriate standard (the breach of duty element); (3) the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries (the cause-in-fact element); (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element); and, (5) actual damages (the damages element). *Rando v. Anco Insulations Inc.*, 16 So. 3d 1065, 1086 (La. 2009). Once more, it is difficult to respond to Defendant's motion because he does not identify any way in which the facts alleged in the complaint fall short. Defendant owed a duty to each of the three Plaintiffs to conform his conduct to a specific standard of care; he breached that duty when he illegally punched, grabbed, pulled, cursed, tightened, and shoved them; each of the plaintiffs allege that this conduct injured them and was the legal cause of their injuries; and they have suffered actual damages.

Finally, Defendant's efforts to shield himself in "discretionary act immunity" pursuant to La. R.S. 9:2798.1 fall short, for two independent reasons: (1) Defendant was not engaged in

"policymaking or discretionary acts" within the meaning of La. R.S. 9:2798.1(B) when he physically attacked, falsely arrested, and maliciously prosecuted Plaintiffs, but was instead involved in misconduct at the operational level, and (2) the alleged misconduct consists of "acts or omissions which constitute criminal, fraudulent, malicious, intentional, willful, outrageous, reckless, or flagrant misconduct," La. R.S. 9.2798.1(C). On the first point, the discretionary function immunity conferred by § 2798.1 only applies to policymaking or discretionary acts. *See Cloud v. Stone*, No. 18-1070, 2019 WL 238066, at *2 (W.D. La. Jan. 16, 2019) (citing *Poche v. Gautreaux*, 973 F. Supp. 2d 658, 674 (M.D. La. 2013). It does *not* protect against legal fault or negligent conduct at the operational level, only for policy decisions (i.e., decisions based on social, economic, or political concerns) at the policy-making or ministerial level. *Lockett v. City of New Orleans*, 639 F. Supp. 2d 710, 745 (E.D. La. 2009) (quoting *Saine v. City of Scott*, 2002-265 (La. App. 3 Cir. 6/12/02); 819 So. 2d 496), *aff'd*, 607 F.3d 992, (5th Cir. 2010); *see also Randle v. Tregre*, 147 F. Supp. 3d 581, 593 (E.D. La. 2015), *aff'd*, 670 F. App'x 285 (5th Cir. 2016). Thus, a "Defendants' reliance on La. R.S. § 9:2798.1 to support their argument that an officer's actions in handcuffing his or her suspect [too tightly] is protected [by discretionary act immunity] is misplaced." *Saine v. City of Scott*, 819 So. 2d 496, 500 (La. App. 3d Cir. 2002). The same is true when a plaintiff alleges that a police officer acted negligently in securing an accident scene, *Misuraca v. City of Kenner*, 802 So. 2d 784, 789 (La. App. 5th Cir. 2001) ("Kenner has not articulated any social, economic or political considerations surrounding the police officer's actions in handling the immediate investigation or securing the accident scene. Thus, Kenner is not immune from liability under La. R.S. 9:2798.1"); or alleges the officer mishandled a complaint regarding a stolen car, *Ducote v. City of Alexandria*, 677 So. 2d 1118, 1122 (La. App. 3d Cir. 1996) ("[T]he officer clearly was acting at the operational level. His

decision . . . was not based on any balancing of social policy . . ."); or alleges the officer made an improper investigatory stop in violation of the Fourth Amendment, *Parker v. Town of Woodworth*, 160 So. 3d 1113, 1132 (La. App. 3d Cir. 2015), *writ denied*, 171 So. 3d 254 (La. 2015). The same is true here.

Independently, Defendant is not entitled to "discretionary act immunity" because the wrongdoing alleged in this complaint is conduct that is "criminal, fraudulent, malicious, intentional, willful, outrageous, reckless, or flagrant misconduct." The closest analogy is *Miller v. Village of Hornbeck*, 65 So. 3d 784, 788 (La. App. 3d Cir. 2011). There, Plaintiff alleged that he was improperly subject to a traffic stop, arrested without probable cause for "resisting arrest," had handcuffs tightly applied, and suffered other physical injuries. *Id.* at 786. He brought an excessive force claim and prevailed at trial. The appellate court affirmed and explained that the record contained sufficient evidence to support the finding that La. R.S. 9:2798.1(C)(2) stripped the officers of immunity for the alleged wrongdoing. *Id.* at 788.

Defendants identifies no law to the contrary on either issue.

WHEREFORE, premises considered, Plaintiffs respectfully request that the Court deny Defendant Troy Lawrence Jr.'s Motion to Dismiss.

> Respectfully submitted,
>
> s/ Thomas W. Frampton
> Thomas W. Frampton (La. Bar No. 35775)
> 580 Massie Road
> Charlottesville, VA 22903
> (202) 352-8341
> tframpton@law.virginia.edu
>
> *Attorney for Plaintiffs*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on the 21st day of January, I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to all ECF registrants who have appeared in this case.

<u>/s/Thomas Frampton</u>